Filed 6/27/13  P. v. Culton CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **THE PEOPLE,**<br><br>     **Plaintiff and Respondent,**<br><br>**v.**<br><br>**DWIGHT CULTON,**<br><br>     **Defendant and Appellant.** | **A133390**<br><br>**(San Francisco County Super. Ct. No. 206260)** |

Joan Baldwin was stabbed to death in 1984.  Police recovered forensic evidence including a bloody fingerprint on Baldwin's thigh and a copious amount of blood from someone other than Baldwin, but the crime remained a "cold case" until 2006, when appellant Dwight Culton was charged with the killing based on DNA and fingerprint analyses.  Appellant was tried before a jury, convicted of first degree murder, and sentenced to prison for 25 years to life.  (Pen. Code, § 187.)[1]

Appellant contends the judgment must be reversed because:  (1) the prosecutor used a peremptory challenge to excuse an African American juror in violation of *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*); (2) his Sixth Amendment right to confront the witnesses against him was violated because a medical examiner who was not the author of the autopsy report was

---

[1] Further statutory references are to the Penal Code unless otherwise indicated.

1

allowed to testify about its contents; (3) the court gave CALCRIM No. 306, regarding the untimely disclosure of defense evidence; (4) the court allowed the prosecutor to cross-examine appellant about his post-arrest silence, violating his rights under the Fifth Amendment; (5) the court excluded relevant evidence concerning third-party culpability; (6) the cumulative effect of these errors was prejudicial; and (7) ex post facto principles precluded an award of direct victim restitution, an award of interest and an administrative fee relating to that restitution, and a parole revocation fine. We agree with the last contention but otherwise affirm.

## FACTS AND PROCEDURAL HISTORY

In 1984, Baldwin worked at an Earl Scheib auto painting shop on Bryant Street in San Francisco. The manager, Ara Derboghossian, allowed her to stay overnight in the shop in an upstairs room when she was having problems at home, but he did not give her the keys because to do so would put his job at risk. When the doors to the shop were locked at night, there was no way for Baldwin to get out of the building.

On the evening of April 5, 1984, Baldwin returned to the shop from happy hour at about 6:00 p.m. She followed Derboghossian as he locked the front and back sliding doors to the shop from the inside and then left the building through the side door, locking it behind him. Earl Scheib employee Mario Leyva arrived for work at about 7:30 the following morning, April 6, 1984, and noticed the shop's front sliding doors—usually closed and padlocked—were unlocked and wide open. He went inside and saw Baldwin's dead and partially unclothed body lying on the floor of the shop's office. Derboghossian arrived for work and summoned the police.

The officers who responded found the following crime scene: Baldwin's body was lying in a pool of blood and had visible wounds on the face, chest, thigh, and right arm. A cutting of skin and hair from the pubic area (later determined to have been made after her death) was on the floor about two feet from her head, and a bloody fingerprint was visible on her right inner thigh. The walls and furniture of the office were bloody, the office floor safe was open, and the cord of the office telephone had been cut. The window on the office door was broken, and broken glass fragments were on the floor.

2

There was blood on the floor outside the office and a footprint was visible on the concrete. A 1969 Buick was missing from the shop and was recovered a few days later on Valencia Street in San Francisco, with a blood stain on the front seat and a bloody tissue inside. A criminalist collected blood samples from the shop and the Buick and preserved them in the crime lab freezer.

Dr. Jose Ferrer performed an autopsy of Baldwin's body and concluded the cause of death was a stab wound to Baldwin's chest penetrating her heart, consistent with a knife wound. Baldwin had cuts on her face and right forearm (the latter possibly a defensive wound), which could have been caused by a knife or a piece of broken glass. There were abrasions on Baldwin's right and left elbows, left eye, right knee and lower back, and a section of skin and hair in her pubic area had been excised by a post-mortem cutting. Holes in Baldwin's blouse (recovered from the scene) were consistent with the wounds to her chest and arm. There was no evidence of trauma to or semen in her vagina.

Blood samples from the case were submitted to the San Francisco crime lab for DNA analysis in 2006. Appellant's DNA matched a blood stain on Baldwin's thigh, blood stains found on the floor and on broken glass found outside the shop office, a blood stain in the middle of the garage area of the shop, and bloodstains found inside the 1969 Buick that was stolen from the shop and later recovered. The possibility a random unrelated person would possess the same DNA profile as the blood on Baldwin's left thigh was one in 5.7 quadrillion American Caucasians or African Americans, one in 61 quadrillion California Hispanics, and one in two quadrillion general population Asians.

The fingerprint on Baldwin's thigh had been submitted to the Automated Fingerprint Identification System in 1984 and received candidates other than appellant for possible matches, but none of those candidates actually matched the print. In 2006, the print from Baldwin's thigh was examined by a fingerprint expert with the San Francisco Police Department who was "completely certain" it was appellant's left thumb print.

3

On November 8, 2006, Inspectors Pera and Toomey of the San Francisco Police Department met with appellant regarding Baldwin's murder. They told appellant he was not under arrest and was free to leave at any time. Appellant acknowledged working as a painter at the Earl Scheib shop on Bryant Street in the early 1980s, and as an assistant manager in 1981 and 1982. He claimed no woman worked at Earl Scheib when he was there, and said he did not know Baldwin or recognize her photo. Told by the inspectors that Baldwin had been murdered in the shop, appellant said he had never heard of the crime. Asked why his DNA might have been found at the shop, appellant said he had fought with a co-worker there. When asked why his DNA was found near Baldwin's body, appellant could not supply an explanation. The inspectors returned several days later with a search warrant to obtain oral swabs from appellant for DNA testing. Appellant protested, but cooperated in giving the sample.

Appellant testified at trial and gave the following explanation of the circumstances linking him to Baldwin's murder: He had been working as an auto body painter at the Earl Scheib shop in San Francisco and eventually became the manager of their shop in Vallejo. On the evening of Baldwin's murder, he was "hustling" on Bryant Street, or "looking for a way to make a buck." Sometime between 7:45 and 8:15 p.m., he noticed the doors of the Earl Scheib shop were open and assumed someone was in there painting cars "off the books" and pocketing the money. Though he no longer worked at that shop, appellant went inside thinking he might be able to make some money. He turned to go into the office when he didn't see anyone in the shop area.

Appellant claimed that as he entered the office, he almost stepped on Baldwin's body and jumped back. He hit the office door with his hand, breaking the glass. He bent down to look at Baldwin and shook her to see if she would respond, but she did not. He walked out of the office "totally confused" with a "thousand thoughts" running through his head, and at some point noticed he was bleeding. Appellant then drove a car away from the shop and left it in a tow-away zone on Valencia Street, near the home of a relative with whom he could talk. His prior convictions included forgery, unarmed bank robbery, five to seven car thefts, and assault with force likely to cause great bodily injury.

4

The defense presented the testimony of Brent Turvey, who the court determined had "the very minimal qualifications" as an expert in crime scene reconstruction.[2]  After reviewing various materials given to him by the defense, Turvey concluded the chain on the front door to the shop had been broken from the inside.  Based on this, he opined Baldwin either opened the door herself or the killer was already inside the shop when the doors were locked.  Turvey believed the crime scene was staged to make it look like someone had broken in and attacked Baldwin.

## DISCUSSION

### I. *Batson/Wheeler*

The prospective jurors who were questioned during voir dire included three African Americans.  One was seated on the jury, one was excused for cause, and the third, No. 2810788, was excused by the prosecutor using a peremptory challenge.  Appellant argues the peremptory challenge to Juror No. 2810788 was racially motivated, and the trial court erred in denying a *Batson/Wheeler* motion brought by his counsel.  We disagree.

### A. *Relevant Proceedings*

During voir dire, Juror No. 2810788 said he lived in the Presidio, was married with two daughters, had worked for Presidio Trust as a carpenter/glazer for the past 10 years, and had worked in the Presidio generally for 27 years.  Defense counsel asked him, "Being the father of young women, would it impact you to know that this is the killing of a woman?"  The juror indicated it would not, and defense counsel continued, "It wouldn't bring to mind your daughters and the possibility that they might be in this situation, at some point?"  Juror No. 2810788 responded, "I would like to think that I've shown them, to the best that I could, that it would be okay."  Asked whether he would

---

[2]  Turvey is an author of books on criminal investigation and profiling.  He is not a doctor, nurse, psychologist, medical examiner, criminalist, or crime scene technician, and his application for membership in the Academy of Forensic Sciences was rejected. Although he claimed to be a sworn peace officer in Alaska, he has never attended a police academy.

have "any kind of an emotional response to the fact that the victim in this case is a woman," the juror stated, "I don't know the person."

Later in the proceedings, the following interchange occurred between the prosecution and Juror No. 2810788: "Q: Your turn. Some of the things we were talking about earl[ier] this morning. First of all, you or any family members that you know of have any type of distasteful or bad experience with police officers? [¶] A: Not that hadn't been worked out with the court system. [¶] Q: Tell me about that? [¶] A: As a teenager, I've had some altercations. I was born and raised here in San Francisco, so I've lived pretty much everywhere in San Francisco, spent three years in [the] Tenderloin District. [¶] Q: Keep your voice up. [¶] A: Spent a few years in the Tenderloin District. Seen a lot of things. [¶] Q: Uh-huh. [¶] A: But where it involved me, it worked out. [¶] Q: Okay. Do you think – well, was this when you were a teenager or as a young adult? [¶] A: Young adult. [¶] Q: And have you had any dealings with the court system? [¶] A: As far as . . . no. [¶] Q: Any type of felony convictions? Any type of arrests or felonies? [¶] A: No. [¶] Q: I'm sorry, I didn't hear you. [¶] A: No. [¶] Q: Okay. And in terms of the way you were treated by the police – or did you have any interactions with the District Attorney's Office? [¶] A: I think at age 19, I had to come here. [¶] Q: And if you – stop you there. If you don't feel comfortable talking about this in front of people, I mean, we can – it can be sensitive issues [*sic*]. We can go back in chambers and talk about it, too. [¶] A: Um, really – I don't think it concerns this case. [¶] Q: Okay. [¶] But, I don't have a problem with it. [¶] Q: Okay. I'd kind of like to know about it? [¶] A: It was a – I had on my person a martial art weapon, and the officer took offense to that. And we ended up going to court, and my lawyer didn't show up. [¶] And they held me in contempt, and that's when I had to deal with the District Attorney. Like I said before, that it seem[ed] to have worked out. [¶] Q: Tell me what happened. [¶] A: The court, the judge, ended up firing my lawyer, holding him in contempt. They let me go on three years' probation for possession of a martial art weapons [*sic*] on my person, instead of . . . [¶] Q: And that was how long ago? [¶] A: I was 19. So over 20 years ago.

6

[¶] Q: What type of martial arts weapon was it? [¶] A: Various martial art weapons. [¶] Q: More than one? [¶] A: Yes."

The prosecutor asked to approach the bench and the court, at his request, asked Juror No. 2810788 to clarify whether he had been put on felony or misdemeanor probation. The juror said it was misdemeanor probation. The prosecutor then resumed his questioning of Juror No. 2810788: "Q: [S]orry to have to ask you about that. Other than that, did you feel this system treated you fairly? [¶] A: Oh, yeah. [¶] Q: Okay. The fact that you're going to be hearing mainly from police officers here, the fact that you had kind of a bad experience when you were 19, are you going to project that onto — [¶] A: No." The prosecutor then asked some additional questions about Juror No. 2810788's approach to evaluating the credibility of witnesses, his views on the burden of proof beyond a reasonable doubt, and circumstantial evidence. He later used his sixth peremptory challenge to excuse Juror No. 2810788.

Defense counsel did not immediately object to the prosecutor's peremptory challenge of Juror No. 2810788, but brought a *Batson/Wheeler* motion during an off-the-record chambers conference held after the morning courtroom session at which the challenge was exercised. Voir dire continued, and after the alternate jurors had been selected and sworn, the parties memorialized the chambers conference on the record.

Defense counsel complained the prosecutor had extensively questioned Juror No. 2810788 about his arrest for weapon possession when he was 19 years old, whereas he had not asked similar questions of or excused two Caucasian jurors who had been arrested for marijuana possession and some sort of civil disobedience. Counsel asked the court to conduct a comparative analysis of these other two jurors and appellant, and suggested the differential treatment during questioning was based on appellant's race.

The prosecutor responded that Juror No. 2810788 had mentioned some encounters with the police but said they were not relevant, and he was concerned the weapons charge the juror described might have been a felony (which could mean the juror was ineligible for jury service and had lied to the Jury Commissioner). The prosecutor asked the court to ask the juror whether the conviction was a misdemeanor or a felony because he did not

7

want to alienate the juror in the event he decided to leave him on the panel. As to the other two jurors with a history of police contacts, the prosecutor explained, "Juror number five said that, at one point in time, he got arrested for being in a car, and there was marijuana in the car. And, I mean, a far cry different from having marijuana in a car, in terms of being armed with weapons. [¶] . . . . then with regards to the last juror, she frankly admitted, and freely admitted, what had happened in terms of her being arrested by the police officers. [¶] Entirely different than being arrested with some type of weapons where she said that she was engaged in civil disobedience on two different occasions."

The trial court indicated it did not believe the *Batson/Wheeler* motion was timely, as it was made after Juror No. 2810788 had been excused and had left the courtroom. It continued, "[E]ven assuming, for purposes of argument that [the motion] was timely, the fact of his – the fact that the conviction had been for a weapons-related charge, multiple weapons, in a case where there's an allegation of murder that was a murder with a weapon, and the fact that the conviction could have been a felony I think warranted the further examination that the District Attorney did of [Juror No. 2810788] in trying to clarify what these issues were. [¶] And so in comparison related to the other jurors, the fact of the political demonstration of disturbing the peace-related issues . . . or the marijuana-related issues. . . I can see that those present different kinds of issues. [¶] So in any comparative analysis, I don't see that there was any problem with the District Attorney's focus on [Juror No. 2810788] going into that inquiry."

The court asked the prosecutor if he had any other comments on his reasons for excusing Juror No. 2810788, and the prosecutor responded, "Well, the other reason is something I think he said yesterday when [defense counsel] indicated that – asked him about the fact that he had two daughters . . . that there was a woman who was murdered in this case, that this was a crime of violence against women, and he was very quick to say, 'I don't know that woman. It doesn't have any effect on me.' [¶] I mean, that type of reaction, to me, is kind of a cold reaction. I would think that anybody that has two daughters would have some type of reaction to the fact that, 'Well, yeah, it does concern

8

me, because I have two daughters.' [¶] Just [the] cold, impersonal nature of that answer also concerned me. [¶] You know, if he would have said, 'Well, yeah, I do have some concerns, but I can put it aside.' He didn't even say that. So that was another thing that really concerned me when I thought about it yesterday."

The court found no pattern of exclusion against African American jurors, concluded the challenge to Juror No. 2810788 was not based on his race, and found race neutral reasons for excusing him from jury service on this case. It denied the *Batson/Wheeler* motion as untimely and on its merits.[3]

B. *Analysis*

As discussed in *Batson, supra,* 476 U.S. 79 and *Wheeler, supra,* 22 Cal.3d 258, both the state and federal Constitutions bar peremptory challenges that are based on a juror's race, ethnicity, or membership in a similar cognizable class. (*People v. Lenix* (2008) 44 Cal.4th 602, 612 (*Lenix* ).) A defendant who suspects a juror has been challenged for a discriminatory reason must bring a motion under *Batson/Wheeler*, at which point the trial court will analyze the claim using a familiar three-prong test. First, it must determine whether the defendant has made a prima facie showing the prosecutor exercised a peremptory challenge based on race, ethnicity or some other impermissible ground. Second, if the showing is made, the burden then shifts to the prosecutor to demonstrate the challenge was exercised for a neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination by evaluating the proffered reasons and determining whether they are legitimate or pretextual. (*Lenix*, at p. 612.)

Appellant suggests this is a "first prong" case, and argues the trial court erred in finding no prima facie case of discrimination. The People respond that the court's ruling was in fact based on the second and third prongs of the *Batson/Wheeler* analysis. We agree with the People because the court made no express finding regarding a prima facie

---

[3] On appeal, the People appropriately concede the motion was timely because the in-chambers objection was made before the alternate jurors were selected and sworn, even though the courtroom discussion occurred afterwards. (*People v. McDermott* (2002) 28 Cal.4th 946, 970.) We consider only the merits of the trial court's ruling.

case of discrimination and resolved the issue by referring to the prosecutor's stated reasons for the challenge and defense counsel's comparative analysis of other jurors with a history of arrests. (*People v. Lewis* (2008) 43 Cal.4th 415, 470-471 [by requesting prosecutor to state reasons for peremptory challenge, court implicitly found prima facie case; in any event, by offering reasons, the prosecutor rendered moot the question of whether a prima facie case existed]; *People v. Bonilla* (2007) 41 Cal.4th 313, 350 [use of comparative analysis not appropriate when determining whether defendant made first-prong, prima facie showing of discrimination].)

Having concluded this is a second- and third-prong case, we review the trial court's determination that the challenge was not discriminatory for substantial evidence, presuming the prosecutor used the peremptory challenge in a constitutional manner and "giv[ing] great deference to the trial court's ability to distinguish bona fide reasons from sham excuses." (*People v. Burgener* (2003) 29 Cal.4th 833, 864 (*Burgener*).) A reason does not need to be well-founded so long as it is not discriminatory. (*Purkett v. Elem* (1995) 514 U.S. 765, 768.) " '[E]valuation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province." ' " (*People v. Stevens* (2007) 41 Cal.4th 182, 198.)

Substantial evidence supports the trial court's denial of the *Batson/Wheeler* motion. The prosecutor explained that he excused Juror No. 2810788 due to concerns about his weapons conviction. A prospective juror's arrest or criminal history or negative experience with law enforcement can serve as a valid basis for a peremptory challenge. (*People v. Lomax* (2010) 49 Cal.4th 530, 573; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1125.)

A comparative analysis of the responses of two seated Caucasian jurors with prior arrests does not alter our conclusion. The first, Juror No. 2945120, was asked about contacts with police officers and explained, "Well, I was arrested when I was 18 for being in a car where they found a small amount of marijuana. So, distasteful experience. Nothing the officer did wrong. I don't think the officer did anything wrong. He was just doing his job." The juror assured the parties nothing about the experience would prevent

him from being fair and impartial. Marijuana possession is a nonviolent offense and the prosecutor could reasonably conclude it was not the equivalent of a prior arrest for illegal weapons, especially in a murder case where a weapon, but no drugs, were involved. (See *People v. Williams* (2006) 40 Cal.4th 287, 311-312 [the marijuana-related arrest of a seated juror's son was not comparable to the extensive criminal history of excused juror's family, which included a rape prosecution resulting in acquittal].)

The second seated juror with a history of police contacts, No. 2665378, had been arrested during a civil disobedience demonstration regarding housing about 10 years earlier and had found the San Francisco police officers she dealt with to be "very courteous and very patient." In 1967, the juror had been convicted of disturbing the peace due to her participation in a protest at the Oakland Induction Center, which consisted of singing Christmas carols. She spent 20 days in jail and described most of the jail guards as "jaded," but found one to be very kind. Finally, Juror No. 2665378 indicated the only bad experience she had ever had with a San Francisco police officer was when the head of the San Francisco Police Officers Association wrote a letter accusing the San Francisco Labor Council (to which she belonged) of being a terrorist organization, an accusation she attributed to political hyperbole. This juror's contacts with law enforcement were a product of her nonviolent political activism, a far different thing than a conviction for possessing multiple illegal weapons.

Appellant suggests a discriminatory intent can be gleaned from the prosecutor's "belated" reliance on appellant's "cold" response ("I don't know the person") when asked whether, as the father of two daughters, he would be affected by the fact the victim in this case was a woman. Appellant suggests this justification was pretextual and notes a seated juror, No. 29255598, simply answered "no" when asked whether he would be concerned about the personal safety of his wife and daughter considering the charged crime involved violence against a woman.

Comparative juror analysis based on the appellate record has inherent limitations. "On appellate review, a voir dire answer sits on a page of transcript. In the trial court, however, advocates and trial judges watch and listen as the answer is delivered. Myriad

11

subtle nuances may shape it, including attitude, attention, interest, body language, facial expression and eye contact. 'Even an inflection in the voice can make a difference in the meaning.' " (*Lenix*, *supra*, 44 Cal.4th at p. 622.) While we do not have the benefit of being able to compare the demeanors of Juror No. 2810788 and the seated juror who commented that he would not be afraid for his wife and daughters, even the bare record suggests a difference in tone. The seated juror simply stated he would not fear for his family's personal safety; the excused juror said he would not have any kind of an emotional response to the case, because he did not know the victim. The first response indicates a lack of fear of appellant, the second suggests emotional indifference to the victim's circumstances.

Because the trial court's denial of the *Batson/Wheeler* motion on its merits is supported by substantial evidence, appellant is not entitled to reversal of the judgment on this ground. (*Burgener*, *supra*, 29 Cal.4th at p. 864.)

## II. *Autopsy Report*

Appellant argues he was deprived of his constitutional right to confrontation (U.S. Const., 6th Amend.) because the court admitted evidence of an autopsy report prepared by a pathologist who did not testify at trial, and allowed a medical examiner called as a prosecution witness to offer opinions based on that report. We disagree.

In *Crawford v. Washington* (2004) 541 U.S. 36, 59 (*Crawford*), the United States Supreme Court held a defendant's federal constitutional right to confrontation prohibits the use of "testimonial statements" of a witness who does not appear at trial unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. Though the court did not—and has not—supplied a bright-line rule for what makes a statement testimonial, such statements "have two critical components. First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution." (*People v. Dungo* (2012) 55 Cal.4th 608, 619 (*Dungo*).) The United States Supreme Court has since considered the meaning of "testimonial" as it relates to official reports offered as evidence when the person who

12

prepared the report does not testify at trial. (See *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 311 [laboratory's sworn "certificates of analysis" stating that a substance was cocaine was testimonial]; *Bullcoming v. New Mexico* (2011) 564 U.S. ___ [131 S.Ct. 2705] [certified laboratory report regarding alcohol content of blood sample was testimonial]; *Williams v. Illinois* (2012) 567 U.S. ____ [132 S.Ct. 2221]) [plurality of the court concluded an expert's testimony regarding a DNA profile by laboratory analyst who did not testify at trial did not violate Confrontation Clause].)

The medical examiner who prepared the autopsy report in this case, Dr. Ferrer, had died by the time of appellant's trial in 2011. Over defense objection, the court allowed prosecution witness and chief medical examiner Dr. Amy Hart to relate the factual findings of the report and to rely on those findings in support of her own opinion regarding the cause and time of Baldwin's death. The court also admitted the report into evidence, finding it to be admissible as a business or official record. (Evid. Code, §§ 1271, 1280.)

It is not necessary in this case to delve into the intricacies of the Confrontation Clause. Apart from the autopsy report, the evidence was overwhelming that Baldwin was attacked, stabbed, and bled to death. The extent of her injuries and cause of her death are not in dispute, and any error relating to that aspect of the evidence would be harmless beyond a reasonable doubt. (*People v. Pearson* (2013) 56 Cal.4th 393, 463-464; *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).) Appellant's claim of *prejudicial* error is limited to a fairly narrow aspect of Dr. Hart's testimony—her opinion regarding the time of death.

Based on the liver temperature recorded by Dr. Ferrer in the autopsy report, Dr. Hart estimated the actual time of Baldwin's death as between 7 and 22 hours before the liver temperature was taken. She indicated that lividity (coloration of the body based on the settling of the blood) could sometimes assist in timing a death, but she did not in this case know the conditions or temperature of the area where Baldwin's body was found. Asked by the prosecutor to assume the body was in a cold warehouse on a concrete floor all night, Dr. Hart testified the death could have occurred between

13

10:00 p.m. and 2:00 a.m., though she acknowledged this range was just an estimate. The 10:00 p.m. to 2:00 a.m. window conflicts with appellant's own testimony that he entered the Earl Scheib shop and found Baldwin already dead between 7:45 p.m. and 8:15 p.m.

Dr. Hart's testimony regarding the time of death was based on the liver temperature recorded in the autopsy report and photographs showing the body's postmortem lividity. In *Dungo*, *supra*, 55 Cal.4th at page 619, the California Supreme Court concluded a pathologist's observations in an autopsy report regarding the condition of a victim's body are not testimonial within the meaning of *Crawford*. Because the only aspect of the report on which the allegedly prejudicial testimony by Dr. Hart was based is not testimonial, her opinion on this point did not violate the Confrontation Clause.

### III. *CALCRIM No. 306*

Appellant argues the trial court erred in giving CALCRIM No. 306, regarding the effect of delayed discovery, as a sanction for the late disclosure of the defense expert on crime scene reconstruction. We conclude any error was harmless.

Under the reciprocal discovery provisions of the Penal Code, the defense must disclose to the prosecution the names and addresses of persons it "intends to call as witnesses at trial" and any reports they made. (§ 1054.3, subd. (a).) The phrase "intends to call" means any person the party reasonably anticipates it is likely to call at trial. (*In re Littlefield* (1993) 5 Cal.4th 122, 130.) The disclosure must be made 30 days before trial or, if counsel becomes aware of a witness after that time, immediately. (§ 1054.7.) If disclosure is not timely made as to any particular witness, the trial court may inform the jury of the failure to disclose. (§ 1054.5, subd. (b).)

The witness list filed by the defense did not include its crime scene reconstruction expert, Brent Turvey, and defense counsel did not disclose his name to the prosecution at least 30 days before trial. Counsel provided Turvey's name and curriculum vitae to the prosecutor on April 6, 2011, five days before jury selection began, and identified him as a "possible expert." On the day before the prosecution intended to rest its case, defense counsel provided the prosecutor with a copy of a report prepared by Turvey. The

14

prosecutor asked that Turvey be excluded as a witnesses because the late disclosure made it difficult to adequately prepare.

Defense counsel advised the court she had not determined a crime scene reconstruction expert was necessary until appellant, on the eve of trial, decided to testify and acknowledge his presence at the auto paint shop on the night of the murder.[4] Until that point, the defense strategy had been to challenge the validity of the physical evidence linking appellant to the crime scene. Counsel represented to the court that once appellant decided to testify, it took her almost two weeks to get approval from her office to speak to the expert. Defense counsel said she disclosed her expert's name as soon as she knew he would be called as a witness, and provided a copy of the expert's report the morning after she received it.

The trial court ruled the delay was not justified, and the late disclosure of the report was a violation of the discovery rules. It declined to exclude Turvey as a witness, and instead instructed the jury with CALCRIM No. 306: "Both the People and the defense must disclose their evidence to the other side before trial, within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial. [¶] The attorney for the defense failed to disclose witness Brent Turvey's report within the legal time period. [¶] In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure. [¶] However, the fact that the defendant's attorney failed to disclose evidence within the legal time period is not evidence that the defendant committed a crime."

We assume for the sake of argument that the timing of the disclosures by defense counsel did not violate the discovery statutes, and that CALCRIM No. 306 should not have been given to the jury. The erroneous giving of CALCRIM No. 306 is analyzed for prejudice under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, which requires reversal only when it is reasonably probable the jury would have reached a result

---

[4] Counsel made this disclosure during an in camera hearing, the transcript of which has been unsealed at appellant's request.

15

more favorable to the defendant if the instruction had not been given. (*People v. Lawson* (2005) 131 Cal.App.4th 1242, 1249, fn. 7 [*Watson* standard applied to error in instructing with CALJIC No. 2.28, the predecessor of CALCRIM 306]; see also *People v. Cabral* (2004) 121 Cal.App.4th 748, 753.)

CALCRIM No. 306 made it clear the jury could only consider the effect of the late disclosures for the purpose of evaluating Turvey's testimony. If fully credited, the jury could have inferred from Turvey's testimony that Baldwin allowed her assailant into the building or was locked in the building with him, and the assailant later attempted to make the crime scene look like a break-in. But Turvey's testimony did nothing to identify any particular person other than appellant as the assailant. The physical evidence linking appellant to the crime was overwhelming, notwithstanding his claim that he came upon Baldwin's body by happenstance and left blood at the scene after cutting his hand on the office door. It is not reasonably probable appellant would have obtained a more favorable result if CALCRIM No. 306 had not been given.

Appellant argues that CALCRIM No. 306 is defective, claiming it invites the jury to speculate about prejudice caused by the late disclosure when there was no evidence regarding its actual effect on the prosecution's case. He relies on cases criticizing a former version of CALJIC No. 2.28 concerning late discovery, and argues CALCRIM No. 306 is similarly deficient. We reject the argument. (*People v. Riggs* (2008) 44 Cal.4th at 248, 307.)

IV. *Cross-Examination About Pre-Miranda Silence*

Appellant contends the judgment must be reversed because the prosecution was permitted, over defense objection, to ask him on cross-examination about his post-arrest, pre-*Miranda* silence after he was taken into custody. We conclude any such error, assuming it has been preserved for appeal, was harmless beyond a reasonable doubt. (*People v. Cunningham* (2001) 25 Cal.4th 926, 994 [violations of a defendant's Fifth Amendment rights evaluated under harmless-beyond-a-reasonable-doubt standard of *Chapman*, *supra*, 386 U.S. at p. 24].)

16

This issue arises in the following context: Defendant voluntarily spoke to Inspectors Pera and Toomey on November 8, 2006, and denied knowing anything about the murder of Joan Baldwin. The inspectors returned eight days later on November 16, 2006, with a search warrant requiring appellant to provide a DNA swab. After he provided the swab, appellant was taken into custody. During cross-examination, the prosecutor asked appellant whether he then told the inspectors the version of events he had told the jury, and appellant responded, "I believe I'd already asked for an attorney." Defense counsel objected. Asked by the prosecutor whether he was told he was being detained for Baldwin's murder, appellant testified that officers from a "separate entity" had handcuffed him, and he was not arrested for the murder until two days later. The prosecutor asked appellant whether he told those officers the story he had told the jury, and appellant responded, "No. As I told you earlier, I'd asked for a lawyer." After this interchange about appellant's request for a lawyer was repeated a couple of times, appellant acknowledged he never spoke to officers in the squad car, on his way to county jail, or at the jail itself. According to Inspector Pera, appellant did not request an attorney when the DNA swab was taken.

Defense counsel argued that the prosecutor's questions about appellant's failure to tell his story violated *Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*), which precludes evidence of a defendant's post-arrest silence following an invocation of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). The prosecutor noted that appellant had been picked up by parole officers on November 18, 2006, the day he provided the DNA swab, but was not arrested for the murder until November 21, 2006. According to the prosecutor, appellant was not given his *Miranda* rights when he was taken into custody on November 18 on the parole violation. Defense counsel responded that appellant had asked for an attorney, even if he was not read his rights under *Miranda*, and was told he was not entitled to one. The trial court determined there was no error under *Doyle*.

The rule in *Doyle* is predicated on the notion that a defendant who is explicitly advised of his right to remain silent under *Miranda*, and then exercises that right, has

17

been given an implied assurance by law enforcement that the silence will carry no penalty. (*Brecht v. Abrahamson* (1993) 507 U.S. 619, 628.) "Thus, the Constitution does not prohibit the use for impeachment purposes of a defendant's silence prior to arrest [citation], or after arrest if no *Miranda* warnings are given, [citation]." (*Brecht*, at p. 628.) The record before us indicates the prosecutor asked appellant about his silence after he had been taken into custody, but before he had been advised of his rights under *Miranda*.

Appellant argues that apart from *Doyle*, the Fifth Amendment precludes the use of a defendant's post-arrest, pre-*Miranda* silence as impeachment evidence when the defendant has invoked the right to counsel. Appellant acknowledges that his trial counsel did not object on this ground, but argues the issue has been preserved for appellate review because it is closely related to the claim of *Doyle* error that was raised at trial.

Even if we assume appellant's current claim has been preserved, no prejudice resulted from the prosecutor's questions about his failure to tell his story when he was taken into custody. The evidence established that appellant had already spoken to police and denied knowing anything about the Baldwin murder, a version of events that directly contradicted his trial testimony that he had stumbled onto the scene after Baldwin had been killed. If the prosecution had not questioned appellant about his post-custody silence, the jury would still have been aware he had lied when he originally spoke to the police investigators.

The evidence of appellant's affirmatively false story was far more incriminating and damaging to his credibility than his silence when taken into custody. In *People v. Hinton* (2006) 37 Cal.4th 839 at page 868, the court similarly concluded a reference to the defendant's post-arrest silence was harmless where the jury already knew the defendant had given false statements to the police: "The problem with defendant's trial testimony was not that the jury heard that he once invoked his *Miranda* rights, but that he repeatedly provided in the other interviews untrue accounts of his involvement in the murders." Any violation of appellant's rights under the Fifth Amendment was harmless beyond a reasonable doubt.

V. *Exclusion of Victim's Hearsay Statements Concerning Third Party*

Appellant argues the trial court erred in excluding evidence that shortly before her murder, Baldwin had told her friend Roberta Edlebrock she was uncomfortable staying overnight in the shop where she worked because she was unnerved by the shop's manager, Ara Derboghossian. According to defense counsel's offer of proof, Baldwin had asked to stay with Edelbrock, and had told her Derboghossian was "creepy" and would come into the area of the shop where she was sleeping at odd hours. Defense counsel argued that Baldwin's statements to Edelbrock were admissible under the state of mind exception to the hearsay rule (Evid. Code, § 1250), and were relevant to support a third party culpability defense pointing to Derboghossian as the actual killer. Counsel argued that this theory was consistent with her crime scene reconstruction expert's testimony that the scene of the crime appeared to have been staged to look like someone had broken in.

To be admissible, evidence of third party culpability must be "direct or circumstantial evidence linking the third person to the actual perpetration" of the crimes for which the defendant is being prosecuted. (*People v. Hall* (1986) 41 Cal.3d 826, 833 (*Hall*).) Third-party culpability evidence is subject to normal state evidentiary rules, and cannot be premised on inadmissible hearsay. (*Id*. at pp. 834-835; *People v. Frierson* (1991) 53 Cal.3d 730, 746 [" '. . . *Hall* did not undertake to repeal the Evidence Code. Incompetent hearsay is as inadmissible as it always was' "]; see also *People v. Bradford* (1997) 15 Cal.4th 1229, 1324-1325; *People v. Adams* (2004) 115 Cal.App.4th 243, 253 (*Adams*).)

Appellant contends Baldwin's statements to Edelbrock were admissible under Evidence Code section 1250, which provides, "(a) Subject to Section 1252 [conditioning admissibility on the trustworthiness of a statement], evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation . . . is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or

19

explain acts or conduct of the declarant. [¶] (b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."

To the extent Baldwin's statements to Edelbrock were offered to prove Derboghossian was the killer, they were hearsay and inadmissible unless authorized by a hearsay exception. (*People v. Noguera* (1992) 4 Cal.4th 599, 622.) A murder victim's hearsay statements describing her fear of the defendant (or, logically, some identified third party) may be admissible under Evidence Code section 1250 when her own conduct in conformity with that fear is at issue, or when there is some evidence the defendant (or a third party) was aware of the victim's fear and may have been motivated by it in some way. (*People v. Ricardi* (2012) 54 Cal.4th 758, 816-820 (*Ricardi*) [defendant's exploitation of victim's fear relevant to show motive and premeditation]; *People v. Waidla* (2000) 22 Cal.4th 690, 725 [victim's fear of defendant relevant to whether she would have consented to defendant's entry into her residence in case where burglary special circumstance alleged].)

Baldwin's statements to Edelbrock were not admissible to prove her own state of mind or conduct because her state of mind and conduct were not issues in the case. (*People v. Ruiz* (1988) 44 Cal.3d 589, 607-610.) Nor were the statements admissible to show Derboghossian had a motive to kill Baldwin, when there was no evidence Derboghossian knew of Baldwin's feelings about him. (*Riccardi*, *supra*, 54 Cal.4th at p. 820.) Rather, the statements were statements of memory and belief offered to prove the fact remembered or believed (that Derboghossian was creepy and had come into the area where Baldwin was sleeping in the shop), and they were inadmissible under Evidence Code section 1250, subdivision (b).

The trial court did not abuse its discretion in excluding the evidence. (*People v. McKinnon* (2011) 52 Cal.4th 610, 658 [ruling under Evid. Code, § 1250 reviewed for abuse of discretion]; *People v. Elliott* (2012) 53 Cal.4th 535, 581 [court's ruling on admissibility of third party culpability evidence reviewed for abuse of discretion].) The defense theory of third party culpability did not render inadmissible hearsay admissible. (*Adams*, *supra*, 115 Cal.App.4th at p. 253.)

20

## VI. *Cumulative Error*

Appellant contends the various trial errors he asserts were cumulatively prejudicial even if they were individually harmless. We have found each claimed error to be either unfounded or harmless when considered separately. Considering them together, we likewise conclude their cumulative effect did not deprive appellant of a fair trial and does not warrant reversal of the judgment. (*People v. Fuiava* (2012) 53 Cal.4th 622, 716; *People v. Bolden* (2002) 29 Cal.4th 515, 567–568.)

## VII. *Restitution- and Fine-Related Issues*

In addition to his prison sentence, appellant was ordered to pay direct victim restitution to Baldwin's family in an amount of $1,245.81, plus interest at an annual rate of 10 percent; an administrative fee of 15 percent of the direct restitution award; and a suspended parole revocation fine of $5,000 pursuant to section 1202.45. Appellant argues these orders violate the federal and state ex post facto clauses (U.S. Const., art. I, § 10, cl. 1; Cal. Const., art. I, § 9), which prohibit legislation making " 'more burdensome the punishment for a crime, after its commission. . . .' " (*Collins v. Youngblood* (1990) 497 U.S. 37, 42; *People v. McVickers* (1992) 4 Cal.4th 81, 84.)[5] We agree.

The murder in this case was committed in April 1984. California law at that time mandated the imposition of a restitution fine on all persons convicted of a felony (§ 1202.4, subd. (a); former Gov. Code, § 13967, repealed by Stats. 2002, ch. 1141, § 10), and payment of direct victim restitution by defendants convicted of crimes and placed on probation (former § 1203.04, repealed by Stats. 1995, ch 313,§ 8). Through legislative oversight, however, no statute authorized trial courts to order the payment of direct restitution to victims by defendants who were convicted of crimes but were not given probation. (*People v. Birkett* (1999) 21 Cal.4th 226, 236–237; *People v. Broussard* (1993) 5 Cal.4th 1067, 1072–1073 (*Broussard*).) This gap was not closed until 1986, when an amendment to former Government Code section 13967 first authorized an order of direct victim restitution in a case where probation was not granted. (*Broussard*, at

---

[5] Appellant does not challenge the imposition of a $5,000 restitution fine.

p. 1074.)  Though restitution is not punitive, its consequences to the defendant are severe enough that it is treated as "punishment" for ex post facto purposes.  (*People v. Zito* (1992) 8 Cal.App.4th 736, 741.)  The trial court's order requiring  appellant to pay victim restitution plus interest, as well as the related administrative fee, must be vacated.[6]

The People agree the parole revocation fine violates ex post facto principles because section 1202.45 was not in effect in 1984.  (*People v. Flores* (2009) 176 Cal.App.4th 1171, 1181-1182.)

### III.  DISPOSITION

The award of direct victim restitution in an amount of $1,245.81 plus interest is stricken, as is the 15 percent administrative fee under section 1202.1 and the $5,000 parole revocation fine under section 1202.45.  As so modified, the judgment is affirmed.

_____

NEEDHAM, J.

We concur.

_____

JONES, P. J.

_____

SIMONS, J.

_____

[6]  Our resolution of this issue makes it unnecessary to address appellant's alternative claim that the administrative fee associated with the restitution order must be vacated because the statute under which it was imposed, section 1203.1, subdivision (l), applies only in cases where probation is granted.

22